# EXHIBIT A

[Indictment]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | 25 Cr. ___ |
| CHRISTINE HUNSICKER, | |
| Defendant. | |

## COUNT ONE
### (Wire Fraud)

The Grand Jury charges:

### Overview

1.    CHRISTINE HUNSICKER, the defendant, defrauded investors in the clothing technology companies CaaStle Inc. and P180 out of more than $300 million. From at least in or about February 2019, up to and including in or about March 2025, HUNSICKER deployed a combination of false statements, misleading claims, and fabricated documents to present CaaStle as a high-growth, private company with substantial available cash when, in truth, and as HUNSICKER well knew, it faced significant financial distress. As the scheme unfolded, HUNSICKER exploited the trust of CaaStle investors, fraudulently inducing them to purchase CaaStle and P180 securities while hiding that she used investors' capital to buoy the failing CaaStle business and to further conceal her fraud.

2.    In or about December 2024, after learning that CHRISTINE HUNSICKER, the defendant, had deceived investors, the CaaStle Board of Directors (the "Board") removed HUNSICKER from the Board and prohibited her from taking any actions on behalf of CaaStle, including soliciting investments. HUNSICKER flouted that prohibition. Peddling the same lies

she had told for years, HUNSICKER continued to solicit millions of dollars in investments for CaaStle and P180. HUNSICKER persisted in her scheme even after law enforcement agents approached her about the fraud.

### HUNSICKER's Scheme to Defraud Investors

3. CHRISTINE HUNSICKER, the defendant, was the founder and Chief Executive Officer ("CEO") of CaaStle. HUNSICKER was widely regarded as a successful businessperson in the fashion-tech industry, earning significant buzz and investor interest. She was named to *Crain's New York Business* "40 Under 40" list, selected as one of *Inc.*'s "Most Impressive Women Entrepreneurs," included in *Inc.*'s "Female Founders 100," and recognized by the National Retail Federation as one of the people shaping the future of retail. In 2011, HUNSICKER launched the business "Gwynnie Bee," a subscription-based clothing service, before rebranding it as "CaaStle" in or around 2018.

4. CHRISTINE HUNSICKER, the defendant, marketed CaaStle as a "clothing-as-a-service" business that enabled clothing brands to rent their clothing inventory to consumers. To the public and to prospective investors, HUNSICKER described CaaStle as a success. She boasted of rapid business growth and promoted the business as the "leading B2B technology company driving the next evolution of inventory monetization for apparel and beyond." HUNSICKER solicited investments from prominent venture capitalists—including investors located in Manhattan, New York—and, at times, valued the CaaStle business at more than $1.4 billion. In fact, and as HUNSICKER well knew, CaaStle was in financial distress with limited available cash and significant expenses.

5. To raise the capital that CaaStle needed to sustain its operations, CHRISTINE HUNSICKER, the defendant, provided existing and prospective investors with false statements,

2

misleading claims, and fabricated documents regarding CaaStle. These lies began by at least in or about February 2019 and continued through in or about March 2025—even after HUNSICKER had admitted to a business partner that she had lied to investors, and even after she had been approached by law enforcement.

6. As part of this scheme, CHRISTINE HUNSICKER, the defendant, provided investors with an array of false documents, including falsely inflated income statements, fake audited financial statements, fictitious bank account records, and sham corporate records. For instance, in or about August 2023, HUNSICKER transmitted to an investor ("Investor-1") a CaaStle income statement reflecting the first two financial quarters of 2023. According to that income statement, CaaStle reported an operating profit of nearly $24 million in the second quarter of 2023. The income statement was fictitious: in truth, CaaStle's operating profit for the second quarter of 2023 was less than $30,000.

7. In or about 2023, CHRISTINE HUNSICKER, the defendant, repeatedly solicited a CaaStle investor ("Investor-2") to purchase additional shares of CaaStle. Investor-2 requested, among other things, copies of CaaStle's audited financial statements. In or about April 2023, HUNSICKER transmitted to Investor-2 what purported to be a final audit of CaaStle by an independent audit firm (the "Audit Firm") for fiscal years ("FY") 2021 and 2020. In reality, HUNSICKER had intentionally altered the FY 2021 and 2020 audit to inflate CaaStle's FY 2021 revenue by more than $100 million. HUNSICKER also transmitted to Investor-2 what purported to be a draft audit of CaaStle by the Audit Firm for FY 2022 and 2021. HUNSICKER had intentionally altered this draft audit as well, falsely reporting that CaaStle's net revenue had nearly doubled to $230 million from FY 2021 to FY 2022 when, in truth, it did not exceed $20 million.

8. In or about August 2023, CHRISTINE HUNSICKER, the defendant, solicited

Investor-2 to purchase still more CaaStle shares. Investor-2 requested a screenshot of CaaStle's bank accounts and a copy of the final FY 2022 and 2021 audit. HUNSICKER emailed Investor-2 a screenshot reflecting that CaaStle had over $50 million in available cash in its bank accounts. The screenshot was fake. HUNSICKER had digitally altered an image to show a $50 million figure that did not exist; in fact, CaaStle had less than $1 million in available cash at the time. HUNSICKER also transmitted to Investor-2 what purported to be the final audit of CaaStle by the Audit Firm for FY 2022 and 2021. But the Audit Firm had never completed the audit for FY 2022 and 2021; HUNSICKER had prepared the falsified final audit herself.

9. CHRISTINE HUNSICKER, the defendant, also falsely represented to investors that their investments would be used to purchase CaaStle shares, at a discount, from existing shareholders who supposedly needed liquidity. HUNSICKER fabricated the existence of those CaaStle shareholders, falsely claiming, among other things, that the shareholders needed money for a "family health emergency" or due to the FTX collapse. HUNSICKER used the investors' money to raise new capital for CaaStle while concealing from investors that CaaStle itself needed cash. To maintain the fiction, after facilitating the supposed secondary sales, HUNSICKER issued fake capitalization tables to the investors to demonstrate that they had purchased existing CaaStle shares.

10. Throughout the scheme, CHRISTINE HUNSICKER, the defendant, acted to conceal her fraud and to dissuade investors from reporting their concerns to others. For instance, in or about October 2023, the Audit Firm questioned HUNSICKER about her transmission of a false audit to Investor-2. During a call with the Audit Firm, HUNSICKER falsely claimed that she had created the fake audit in connection with a lecture that she gave at Princeton University, and that sending the audit to Investor-2 had been a one-time error, unrelated to the solicitation of any

4

investment. In fact, there was no such lecture, and HUNSICKER had provided two fabricated audits to Investor-2 while soliciting an investment from Investor-2. Just a few hours before the call with the Audit Firm, HUNSICKER had conducted internet searches for "fraud," "created an audit firm fake," and "JP morgan 4m records faked," an apparent reference to the fraud related to JP Morgan's acquisition of the startup "Frank," which resulted in the federal prosecution of Frank's founder. One week later, Investor-2 contacted HUNSICKER about the same fake audit. To avoid public exposure of her scheme, HUNSICKER repaid Investor-2 the value of Investor-2's investment in CaaStle.

11.     CHRISTINE HUNSICKER, the defendant, was undeterred by her exchanges with the Audit Firm and Investor-2. She continued to solicit investments in CaaStle based on misrepresentations and fake audited financial statements. For example, in or about September 2024, HUNSICKER provided an investor ("Investor-3") with a fake screenshot of CaaStle's bank accounts reflecting that CaaStle had nearly $200 million in available cash. In fact, CaaStle had less than $200,000 in available cash at the time. When Investor-3 requested a copy of the actual bank statement, HUNSICKER refused, falsely claiming that the CaaStle Board would not allow her to share the information. To avoid public exposure of her scheme, HUNSICKER allowed Investor-3 to redeem its investments in CaaStle.

12.     In or about October 2024, CHRISTINE HUNSICKER, the defendant, provided an investor ("Investor-4") with a fake draft audited financial statement for FY 2023 and 2022, supposedly issued by the Audit Firm. Investor-4 learned that the Audit Firm had not prepared the audit and confronted HUNSICKER during a meeting at the CaaStle office in Manhattan. HUNSICKER feigned ignorance and promised to get back to Investor-4. Instead, as soon as Investor-4 left the office, HUNSICKER conducted an internet search for "faking an audit." Then,

5

to avoid public exposure of her scheme, HUNSICKER offered to buy Investor-4's total investment in CaaStle. Investor-4 instead reported HUNSICKER's conduct to the CaaStle Board.

13. In or about 2024, CHRISTINE HUNSICKER, the defendant, solicited investments from an additional investor ("Investor-5") making the same false and misleading statements about CaaStle that she had made to other investors. For this investment, Investor-5 required HUNSICKER to provide signed documents from the Board confirming that the Board had authorized the grant of stock options to Investor-5. Instead of disclosing the transaction to the Board, HUNSICKER falsified documents to make it appear that the Board had authorized the stock option grant. Specifically, HUNSICKER falsified the signature of a Board director (the "Director") to create the appearance of legitimate board authorization, even though she had never obtained actual Board approval, and the Director had never signed the documents. Based on these falsified Board documents, HUNSICKER raised more than $20 million of investments in CaaStle.

14. In total, based on the false and fraudulent statements and representations of CHRISTINE HUNSICKER, the defendant, regarding CaaStle, HUNSICKER raised more than $275 million of investments in CaaStle.

15. In addition to the false statements and fictitious documents directed at CaaStle investors, CHRISTINE HUNSICKER, the defendant, also submitted similar false information about CaaStle to an FDIC-insured financial institution located in Manhattan (the "Bank") in order to obtain and keep a personal loan. Specifically, in or about December 2019, HUNSICKER applied for and obtained an $18 million personal loan from the Bank, which loan was increased to $20 million in December 2020. In or around 2024, to demonstrate that she held sufficient collateral to secure the loan, HUNSICKER submitted falsified CaaStle income statements, which purported to show that CaaStle had over $100 million in revenue and over $32 million in available cash. In fact,

CaaStle had less than $16 million in revenue at that time, and held less than $1 million in available cash. As a result of HUNSICKER's false representations, HUNSICKER was able to maintain the loan from the Bank.

### HUNSICKER's Scheme to Defraud Investors Extends to P180

16. In or about 2024, CHRISTINE HUNSICKER, the defendant, turned her attention to her new business venture, P180. Publicly, HUNSICKER touted P180 as a business that would acquire ownership interests in clothing brands and revitalize their e-commerce businesses by leveraging CaaStle's technology to increase brand sales and limit losses on markdowns. Privately, however, HUNSICKER planned to use the investments in P180 to infuse CaaStle with much-needed cash before CaaStle investors discovered her fraud.

17. CHRISTINE HUNSICKER, the defendant, intended to sell millions of P180 securities (in the form of shares and convertible notes) to existing CaaStle investors and then to funnel that money back to CaaStle disguised as payments by P180 for the use of CaaStle's technology. But just as she had done to raise money for CaaStle, HUNSICKER attempted to raise money for P180 by providing prospective investors with false information regarding CaaStle's commercial success. In addition to repeating affirmative misstatements about CaaStle's revenue, income, and operating profit, HUNSICKER also failed to disclose that her prior representations regarding CaaStle's financial performance—including those made through fake documents—had been false and thus that P180 would not have the strong commercial engine in CaaStle that HUNSICKER claimed.

18. Based on these misrepresentations and omissions, CHRISTINE HUNSICKER, the defendant, raised approximately $30 million of investments in P180, issuing investors both equity shares and convertible notes for P180.

7

19. In or about late 2024, CHRISTINE HUNSICKER, the defendant, used the proceeds of her CaaStle scheme to finance several business ventures for P180. Specifically, HUNSICKER transferred more than $14 million from CaaStle—obtained through misrepresentations and fraudulent omissions to investors—to finance, among other things, P180's acquisition of a popular clothing brand. In addition, at a point when CaaStle's dire financial condition was clear to HUNSICKER, she used $6 million in investor funds obtained through fraud to purchase CaaStle shares from her close associate and former co-founder at CaaStle ("Individual-1"), effectively transferring victim funds to a friend, while other CaaStle investors—ignorant of the company's troubled financial condition—were left holding CaaStle shares of deteriorating value.

**HUNSICKER Continued to Solicit Investments in CaaStle and P180 Based on Lies**

20. In or about December 2024, after Investor-4 had reported CHRISTINE HUNSICKER, the defendant, to the CaaStle Board, the Board removed HUNSICKER as Chairperson of the Board. The Board permitted HUNSICKER to remain as CEO of CaaStle but prohibited her from taking any actions on behalf of CaaStle, including soliciting investments. HUNSICKER disregarded that prohibition. In or about January 2025, HUNSICKER sold $8 million of her CaaStle shares to a CaaStle investor, failing to disclose material information regarding the CaaStle business. That same month, HUNSICKER sold more than $5 million in P180 convertible notes to several CaaStle investors, again failing to disclose material information to investors, to whom she had a duty to disclose.

21. In or about February 2025, CHRISTINE HUNSICKER, the defendant, attempted to sell an additional $19 million of her CaaStle shares to Investor-1. After meeting with Investor-1 to discuss the transaction, HUNSICKER conducted an internet search for "bank fraud vs. wire fraud severity." Then, in or about March 2025, HUNSICKER provided Investor-1 with the same

8

fake draft audited financial statement for FY 2023 and 2022 that she had provided to Investor-4 months earlier. The following week, law enforcement agents approached HUNSICKER and seized her electronic devices. Even after being confronted by law enforcement, HUNSICKER continued to meet with Investor-1 to discuss the fake audit, never revealing that the audit was fabricated or that she had been removed from the Board and was prohibited from taking any actions on behalf of CaaStle.

22.    On or about March 29, 2025, the Board disclosed to CaaStle investors that CHRISTINE HUNSICKER, the defendant, had misstated CaaStle's financial statements and falsified audited financial statements. HUNSICKER resigned as CEO from CaaStle and from her related venture, P180. On or about June 20, 2025, CaaStle filed for Chapter 7 bankruptcy, resulting in hundreds of CaaStle investors holding now-worthless CaaStle shares.

### Statutory Allegations

23.    From at least in or about 2019, up to and including in or about March 2025, in the Southern District of New York and elsewhere, CHRISTINE HUNSICKER, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, HUNSICKER engaged in a scheme to obtain money from investors by means of false and misleading statements about CaaStle's financial condition, and in furtherance of that scheme used interstate wires, some of which transited to, from, or through the Southern District of New York.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO

### (Fraud in the Purchase and Sale of CaaStle Securities)

The Grand Jury further charges:

24.    The allegations contained in paragraphs 1 through 22 of this Indictment are repeated and realleged as if fully set forth herein.

25.    From at least in or about 2019, up to and including in or about March 2025, in the Southern District of New York and elsewhere, CHRISTINE HUNSICKER, the defendant, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, HUNSICKER engaged in a scheme to defraud by submitting false and fabricated financial statements about CaaStle to prospective and current investors, in connection with the acquisition of the equity shares, options, and warrants of CaaStle.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE

### (Fraud in the Purchase and Sale of P180 Securities)

The Grand Jury further charges:

26.    The allegations contained in paragraphs 1 through 22 of this Indictment are repeated and realleged as if fully set forth herein.

27.    From at least in or about 2024, up to and including in or about March 2025, in the Southern District of New York and elsewhere, CHRISTINE HUNSICKER, the defendant, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, HUNSICKER engaged in a scheme to defraud by submitting false and fabricated financial statements about CaaStle and P180 to prospective and current investors, in connection with the acquisition of equity shares and convertible notes of P180.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT FOUR

### (False Statements to a Financial Institution)

The Grand Jury further charges:

28. The allegations contained in paragraphs 1 through 22 of this Indictment are repeated and realleged as if fully set forth herein.

29. From at least in or about December 2019 through in or about December 2024, in the Southern District of New York and elsewhere, CHRISTINE HUNSICKER, the defendant, knowingly made a false statement and report, and willfully overvalued land, property, and security, for the purpose of influencing the action of a financial institution, the accounts of which were insured by the Federal Deposit Insurance Corporation, in connection with an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, and loan, and insurance agreement and application for insurance and a guarantee, and charge and extension of any of the same, by renewal, deferment of action and otherwise, and the acceptance, release and substitution of security therefor, to wit, HUNSICKER transmitted false statements regarding, among other things, the revenue and available cash of CaaStle in order to maintain a $20 million loan at the Bank, which was located in the Southern District of New York.

(Title 18, United States Code, Sections 1014 and 2.)

## COUNT FIVE

### (Engaging in a Monetary Transaction in Property Derived from Specified Unlawful Activity)

The Grand Jury further charges:

30. The allegations contained in paragraphs 1 through 22 of this Indictment are repeated and realleged as if fully set forth herein.

31. In or about 2024, in the Southern District of New York and elsewhere, CHRISTINE

12

HUNSICKER, the defendant, within the United States, knowingly engaged and attempted to engage in a monetary transaction, as defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, HUNSICKER transferred millions of dollars to Individual-1 and to P180 consisting of proceeds from the wire fraud and securities fraud charged in Counts One, Two, and Three of this Indictment, including to a bank account located in the Southern District of New York.

(Title 18, United States Code, Sections 1957 and 2.)

## COUNT SIX
### (Aggravated Identity Theft)

The Grand Jury further charges:

32.     The allegations contained in paragraphs 1 through 22 of this Indictment are repeated and realleged as if fully set forth herein.

33.     In or about 2024, in the Southern District of New York and elsewhere, CHRISTINE HUNSICKER, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, HUNSICKER created falsified documents of the CaaStle Board bearing the name and signature of a Director of the Board and reflecting that the Board had authorized the grant of stock options to Investor-5, during and in relation to the wire fraud charged in Count One of this Indictment.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

## FORFEITURE ALLEGATIONS

34.     As a result of committing the offenses alleged in Counts One, Two, and Three of this Indictment, CHRISTINE HUNSICKER, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code,

13

Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses, and the following specific property:

  a. Any and all monies, assets, and funds contained in the JPMorgan Chase Bank account ending in 5774, held in the name of CaaStle;

  b. Any and all monies, assets, and funds contained in the JPMorgan Chase Bank account ending in 0775, held in the name of HUNSICKER;

  c. Any and all monies, assets, and funds contained in the JPMorgan Chase Bank account ending in 0093, held in the name of HUNSICKER; and

  d. Any and all monies, assets, and funds contained in the Bank of America account ending in 2324, held in the name of CaaStle.

35. As a result of committing the offense alleged in Count Four of this Indictment, CHRISTINE HUNSICKER, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property constituting or derived from, proceeds obtained directly or indirectly, as a result of the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

36. As a result of committing the offense alleged in Count Five of this Indictment, CHRISTINE HUNSICKER, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

37. If any of the above-described forfeitable property, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred

14

or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

Jay Clayton

JAY CLAYTON
United States Attorney

15