UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In Re: | . | Chapter 7 |
|  | . |  |
|  | . | Case No. 25-11187(BLS) |
| CaaStle, Inc., | . |  |
|  | . | 824 Market Street |
|  | . | Wilmington, Delaware 19801 |
| Debtor. | . |  |
| . . . . . . . . . . . . . . . . . | . | Wednesday, November 19, 2025 |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Chapter 7 Trustee
George L. Miller:              Peter C. Hughes, Esq.
                              DILWORTH PAXSON, LLP
                              800 North King Street
                              Suite 202
                              Wilmington, Delaware 19801


For KSV CaaStle Holdings LP
and KSV CaaStle Holdings
II LP:                        Anthony W. Clark, Esq.
                              GREENBERG TRAURIG, LLP
                              222 Delaware Avenue, Suite 1600
                              Wilmington, Delaware 19801

                              Ketan M. Ganase, Esq.
                              GREENBERG TRAURIG, LLP
                              333 S.E. 2nd Avenue, Suite 4400
                              Miami, Florida 33131



(Appearances Continued)

Audio Operator:               Electronically Recorded
                              by Dana L. Moore, ECRO

Transcription Company:        Reliable
                              1007 N. Orange Street
                              Wilmington, Delaware 19801
                              (302)654-8080
                              Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:  (Continued)

For P180, Inc.:                Richard W. Riley, Esq.
                               PASHMAN STEIN WALDER HAYDEN, PC
                               824 North Market Street
                               Suite 800
                               Wilmington, Delaware 19801

For an Investor Group:         Melissa Hartlipp, Esq.
                               COLE SCHOTZ, PC
                               500 Delaware Avenue, Suite 1410
                               Wilmington, Delaware 19801

                               Lawrence P. Eagel, Esq.
                               BRAGAR, EAGEL & SQUIRE, P.C.
                               810 Seventh Avenue, Suite 620,
                               New York, New York 10019

3

<u>INDEX</u>

<u>PAGE</u>

Motion of George L. Miller, Chapter 7 Trustee for (I)      8
Authority to Retain Heritage Global Partners, Inc. as
Auctioneer to Sell Certain IP Assets of the Debtor,
(II) Approval of Auction Procedures, (III) Approval
of the Sale of Certain IP Assets of the Debtor Free
and Clear of Liens, and (IV) Related Relief
[Filed: 10/30/2025; D.I. 101]

Motion of George L. Miller, Chapter 7 Trustee for (I)      9
Authority to Retain Heritage Global Partners, Inc. as
Auctioneer to Sell Certain IP Assets of the Debtor,
(II) Approval of Auction Procedures, (III) Approval of
the Sale of Certain IP Assets of the Debtor Free and
Clear of Liens, and (IV) Related Relief
[Filed: 10/30/2025; D.I. 101]

| <u>WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|

<u>FOR THE CHAPTER 7 TRUSTEE</u>

| GEORGE L. MILLER | * | 18 | | |
|---|---|---|---|---|

*Direct via Declaration/Affidavit

| <u>EXHIBIT</u> | <u>EVID.</u> |
|---|---|
| T-1  KSV Florida Complaint | 26 |
| T-2  P180 S.D.N.Y. Complaint | 26 |
| T-3  Miller Declaration | 17 |
| T-4  Florida Docket. | 26 |
| T-5  CNA Insurance Policy | 26 |
| T-6  Zurich Insurance Policy | 26 |
| KSV-1 through KSV-6 | 27 |

(Proceedings commence at 11:13 a.m.)

(Call to order of the Court)

THE COURT:  Please be seated.

Good morning.

PARTICIPANTS:  Good morning, Your Honor.  Good morning.

THE COURT:  Mr. Hughes, good to see you.  It's been a while.

MR. HUGHES:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. HUGHES:  It's nice to be back in your courtroom.

Your Honor, we have -- this case has been pending since June, but we've not actually been in court yet, so, if I may, I want to just provide a brief overview of the case for the Court.

THE COURT:  That sounds great.

MR. HUGHES:  Your Honor, CaaStle, Inc. was a company which rented clothing to consumers.  The consumers would pay for subscription and rent the clothes, rather than buy them.

Later on, in addition to dealing directly with consumers, the company provided services to other apparel companies to -- as a platform to allow them to rent clothes.

Christine Hunsicker was the founder and the CEO of

the debtor.  She was indicted on July 17th of this year in the Southern District of New York.  According to the indictment, the company was formed in 2011 and originally called Gwynnie Bee; in 2018, it was re-branded as CaaStle, but still the same corporation.

And Hunsicker was widely regarded as a very successful businessperson.  She was on Crane's New York Business 40 Under 40 list, she was Inc.'s Female Founders 100, and she was on Inc.'s Most Impressive Entrepreneurs list.  She was very active in seeking investors for the company; and at one time, the CaaStle business was purported to be valued at 1.4 billion, with a B, dollars.

Your Honor, the indictment alleges that there was a massive fraud at the company over a long period of time that was orchestrated by Ms. Hunsicker, that she deceived investors with false documents.

As an example, it's alleged that she altered the Fiscal Year 2020 and 2021 audit reports to inflate revenue by more than $100 million, and audited -- I'm sorry -- altered the audit reports to show that net revenue had doubled to $230 million from Fiscal Year 2021 to '22, when, in fact, it didn't actually exceed $20 million.

And a further example -- and there are many -- is that she is alleged to have digitally altered an image to show over $50 million in available cash in the bank for the

company, when, in fact, the company had less than a million dollars at the time in the bank.

So the facts are quite startling.  This is not a matter of fudging the numbers by a little bit.  It's just a, you know, very substantial inflation of numbers.

The indictment further alleges that, in December of 2024, an investor reported Ms. Hunsicker to the board, but that it wasn't until March 29th of 2025 that the board disclosed the falsified financial statements.

And it also asserts that Ms. Hunsicker remained as CEO of the company, even after the board knew of the fraud, from December of 2024 to March of 2025.

The indictment includes counts for wire fraud, fraud in the purchase and sale of securities, false statements to financial institutions, and aggravated identity theft.

The Chapter 7 was filed on June 20th of this year, and it went straight to a Chapter 7, and it's just a single debtor.

The 341 meeting was held and concluded on July 23rd.  The Trustee Mr. Miller, has gathered a significant amount of information and continues to do so and is investigating claims.

We have obtained approval for a sharing agreement with the only known secured creditor, that's Ichigo Asset

Management International.  They assert a five-million-dollar secured claim.  And we have already had that agreement approved by the Court.

We have, Your Honor, conduced previously a sale of tangible assets using an auctioneer.  Those were assets located in warehouses in Ohio and Arizona.  I'm happy to report that that went well and it has been concluded and we filed the report of that auction.

Included in the agenda today, and it's the first item on the agenda, is a sale of intellectual property assets or IP assets.  If that is approved today, that will complete the asset sales in the case.

The debtor did have four physical locations, two office leases and two warehouse locations.  We have vacated all of those properties and rejected those leases.

So, following the sale of the intellectual property, the main focus in the case going forward will be on litigation, both avoidance actions and director and officer actions.

So, Your Honor, that is my overview of the case.

THE COURT:  So let me ask you a question about the sale motion that is Agenda Item Number 1.  At least according to the agenda, unless I've missed something, that motion is uncontested.  Am I correct?

MR. HUGHES:  Correct, Your Honor.

THE COURT:  Okay.  Shall we deal with that one or --

MR. HUGHES:  Yes.

THE COURT:  I don't believe I've seen a CNO on that, so ...

MR. HUGHES:  Yes.  The only reason we didn't file a CNO is the twenty-four-hour rule.

THE COURT:  Got it.  Okay.

MR. HUGHES:  We're just outside that.

THE COURT:  Well, I've reviewed that motion.  And I would ask if anyone wishes to be heard in connection with the trustee's request for authority.  This is the -- is this the sale?  Hang on.  I have a -- yeah, and approval of -- so it's the retention of Heritage and the sale.

MR. HUGHES:  Correct, Your Honor.

THE COURT:  Right.

I would ask if anyone wishes to be heard with respect to that motion.

(No verbal response)

THE COURT:  Okay.  Given the absence of objection, I appreciate you waiting, just to make sure that there were no objections.  But I don't have any issues with it and, had it been submitted under CNO, I'm sure I would have signed that promptly.

So I'm satisfied that the trustee has carried his

burden and that the relief requested is appropriate and warranted, and I would be prepared to enter that order once it's submitted under CNO.  Okay?

MR. HUGHES:  Thank you, Your Honor.

THE COURT:  Very good.

MR. HUGHES:  Your Honor, the next item on the agenda is our motion for a preliminary injunction.  If I may, I'll just gather that set of papers here.

THE COURT:  Sure.

(Pause in proceedings)

MR. HUGHES:  Your Honor, with respect to the motion for an injunction, the trustee has filed a complaint for declaratory and injunctive relief, a motion for injunctive relief, and a brief in support of that motion.

Your Honor, the subject matter of the injunction is competing litigation.

THE COURT:  Let me ask you a question --

MR. HUGHES:  Yes.

THE COURT:  -- before we get going.  I appreciate getting the witness and exhibit lists from the parties.  I have one from Mr. Clark and I have one from you, Mr. Hughes.  I just want to make sure what my dance card looks like.  Are the parties expecting to call witnesses today?  Are we proceeding on the papers?  I think I just want to make sure I understand.

I couldn't really discern that from the parties' submissions.  Obviously, I've got a good deal of papers from the parties on the briefing of this motion, as well as the lift-stay motion and others.

MR. HUGHES:  Sure.

THE COURT:  What does it look like?

MR. HUGHES:  We have listed George L. Miller, the Chapter 7 Trustee, as our witness, Your Honor.  There is an affidavit among our exhibits, and that was submitted with the motion.

THE COURT:  I have the -- I have that affidavit.

MR. HUGHES:  Yeah.  I would plan to, if it's acceptable to the Court, offer that -- make a proffer of that affidavit as Mr. Miller's direct testimony and ask if anyone wants to cross-examine him.

THE COURT:  Okay.  And that would be the trustee's only witness, right?

MR. HUGHES:  Correct, Your Honor.

THE COURT:  Great.

Mr. Clark, good morning.  It's good to see you, as always.

MR. CLARK:  Good morning.  Always an honor to appear before Your Honor.

We have no witnesses.  I have, I think, some very brief cross-examination for Mr. Miller.

We do not object to any of the trustee's proposed exhibits, and I believe the same is true for our exhibits by the trustee, but I'll let Mr. Hughes respond to that.

MR. HUGHES:  Correct, Your Honor.  We're in agreement that, with respect to all the exhibits from each party, that they are all admissible.

THE COURT:  That sounds great.  As always, I appreciate the coordination between counsel in advance to streamline this process.  That's fine.  I'm happy to start moving forward.

Just in terms of mechanics, I have a meeting with my colleagues at 12:15; that would go until 1.  So I'm assuming we will not be done by 12:15, and then we would reconvene at one o'clock.  And again, I apologize for truncating the hearing, but that's what I got.

MR. HUGHES:  Understood, Your Honor.

THE COURT:  And so, with that, I'm at your pleasure.  But it sounds like most of this will be argument.

MR. HUGHES:  A good portion, Your Honor.

THE COURT:  Okay.  You may proceed.

MR. HUGHES:  Thank you.

And to be picky, we do have two exhibit binders: One is with respect to the injunction and the adversary; we have a separate binder with respect to the relief from stay motion.

THE COURT:  I have that, as well, up here.

MR. HUGHES:  And --

THE COURT:  Sorry about that.

MR. HUGHES:  -- there is some overlap.  In an ideal world, we would have -- we would have eliminated the duplicates, but we ran out of time.

THE COURT:  Okay.

MR. HUGHES:  Your Honor, the subject matter of the injunction motion is competing litigation.  KSV filed a complaint in Florida, which is against Ms. Hunsicker only; she's the only defendant.  That alleges causes of action for breaches of fiduciary duty, negligent misrepresentation, and fraudulent inducement.

P180 also filed a complaint in the Southern District of New York, that was against Hunsicker and several other directors and/or officers.  Those claims include -- there's a lot of them and I won't name all of them, but they include claims for RICO, conversion, breach of fiduciary duties as directors of P180.

And then the third set, there's a group of investors that we've referred to as the "investor group."

THE COURT:  Uh-huh.

MR. HUGHES:  They are represented by Mr. Eagel, who is here today.

THE COURT:  Welcome, sir.  Good to see you.

MR. HUGHES:  There are approximately 32 claimants who were shareholders, investors.  They have not filed claims as of now.  But of course, the KSV and the P180 actions are pending in their respective courts.

So, Your Honor, I'm happy to report that we have -- and this is reflected in the agenda, the amended agenda, that we've entered into a settlement stipulation with respect to the preliminary injunction motion, as to both P180 and the investor group.

The P180 stipulation has been signed and submitted under certification of counsel, and I believe an order has already been entered.

The investor group, we are in agreement on the form of it.  We haven't actually signed it and submitted it, but we will.  We've got that resolved.

Your Honor, the trustee is in the process of investigating claims against directors and officers, and he intends to bring one or more actions for breach of fiduciary duty and related claims.  They would include claims against -- claims relating to the fraud perpetrated at the company and a lack of oversight by directors.  And the current expectation is that we'll have that filed by mid December at the latest.

Your Honor, the claims asserted by KSV and the claims that will be asserted by the trustee certainly have a

14

common nucleus of facts.  It all relates to the massive fraud that occurred at the company, the misrepresentation of the financials of the company on a large scale.  And we will allege that others in management also breached their fiduciary duty.

The KSV action has proceeded very rapidly, Your Honor.  They obtained a default judgment in a total amount --

THE COURT:  Fifty million.

MR. HUGHES:  -- exceeding $50 million.

THE COURT:  I saw it.

MR. HUGHES:  Ms. Hunsicker moved to vacate the default, and that has already been denied, and KSV has already commenced execution proceedings on that.  And of course, as part of our agenda today -- Item 3, I think it is -- KSV has moved for relief from stay to collect on the D&O policy.  And, if successful, with their fifty-million-dollar judgment, presumably --

THE COURT:  That would --

MR. HUGHES:  -- they would --

THE COURT:  -- extinguish the policy.  The policy is 5 million, right?

MR. HUGHES:  Yes, there are --

THE COURT:  All in.

MR. HUGHES:  There are --

THE COURT:  And there are two policies.

MR. HUGHES:  Correct.

THE COURT:  All in, 5 million.

MR. HUGHES:  Correct, Your Honor.

THE COURT:  Got it.

MR. HUGHES:  Your Honor, one of the trustee's duties here is to try to recover assets for the benefit of creditors, including, of course, bringing the D&O actions. His ability to do that is threatened by competing lawsuits by investors.  These are claims against the same individuals, they're based on the same underlying facts, and they're attempting to collect from a limited pool of assets.

Your Honor, if I -- if it's helpful to the Court, I can explain the terms of the settlement with P180.  I'm not sure that you want to hear all of that, but I'm happy to report it if --

THE COURT:  No, I think it would helpful just because it's part of the context of the overall litigation --

MR. HUGHES:  Sure.

THE COURT:  -- and the trustee's request for injunctive relief related to pressures from P180, as well a from KSV.  You may proceed.

MR. HUGHES:  Thank you.

Your Honor, I'll give a summary and I'll give the usual caveat that there are written stipulations --

THE COURT:  I got it.

MR. HUGHES: -- that resolve this. So, if my explanation differs from the exact terms of the stipulation, the stipulation controls.

Your Honor, with the investor group, the stipulation is to the effect that they are permitted to file their claims, which they wanted to do to preserve statutes of limitations, and they're permitted to serve their complaint.

Once that happens, the action or actions are stayed for six months, and then they can come back and address the injunction issues with the Court at that point in time. And I'm giving an overview and not getting down into all the --

THE COURT: Right.

MR. HUGHES: -- small details.

With P180, Your Honor, the preliminary injunction motion is continued as to P180 for 150 days. The parties will confer in the meantime. And if necessary, if we need to go forward, the parties will simultaneously submit briefs to the Court 10 days before the hearing or whenever the Court wants them.

And during the term of the stipulation, for five of the counts brought by P180, the activity is limited to initial disclosures and requests for documents, meaning they can't do interrogatories --

THE COURT: Full --

MR. HUGHES: -- they can't do --

THE COURT:  No full-on discovery.

MR. HUGHES:  Yes.

THE COURT:  Okay.

MR. HUGHES:  And of course, the parties reserve their rights as to the merits, if we are back in front of you.

Your Honor, at this point, I would like to proffer the affidavit of George Miller --

THE COURT:  Okay.

MR. HUGHES:  -- which is included as Exhibit T-3, Trustee 3.

THE COURT:  Okay.

MR. CLARK:  That's in the adversary proceeding binder.

THE COURT:  Yep, I have it.

MR. HUGHES:  Yes.  And I would offer -- proffer that testimony and ask if there is any cross-examination.

THE COURT:  First I'll ask:  Is there any objection to the admission of this declaration, subject to the opportunity to cross-examine?

MR. CLARK:  No objection.

THE COURT:  Very well.  The declaration is admitted.

(Exhibit T-3, Miller Declaration, received in evidence)

THE COURT:  Mr. Clark, I think you said you would

like the opportunity to cross-examine Mr. Miller.

MR. CLARK:  Very briefly.

THE COURT:  All right.  Mr. Miller, can you come on up, sir?  Good morning.  Good to see you again.

THE WITNESS:  Good morning, Your Honor.  Yes, it's been a while.

THE COURT:  Too long.

All right.  Madam Court Reporter, would you swear the witness, please?

GEORGE L. MILLER, CHAPTER 7 TRUSTEE, SWORN

THE ECRO:  Please state and spell your last name for the record.

THE WITNESS:  George L. Miller, M-i-l-l-e-r.

THE ECRO:  Thank you.

THE COURT:  Welcome.

(Participants confer)

MR. CLARK:  May I approach the witness, Your Honor?

THE COURT:  Of course.

CROSS-EXAMINATION

BY MR. CLARK:

Q   Good morning, Mr. Miller.  I just have a couple of questions for you.

In the binder I just handed up to you, Exhibit T-3.  Can you take a look at that and identify that for me?

A   Yes.  That's the Affidavit of George L. Miller, solely

in his capacity as Chapter 7 Trustee, plus additional sentences. It's signed by me on the last page --

Q   I'd like --

A   -- and notarized.

Q   -- you to take a look at Paragraph 11 in your declaration. I just want to clear up some of the -- clear up a couple of facts. In 11, Paragraph 11(a), you indicate that the coverage limit under the CNA policy -- that's the primary D&O policy, right?

A   Yes.

Q   That the coverage limit under the CNA policy is $2 million. Is that correct?

A   Yes.

Q   Now I'd like you to turn to Exhibit T-5. Is that a -- it's a lengthy document. But does that appear to you to be the CNA policy?

A   Yes, it does.

Q   If you'd turn to Page 14 of 138. If you look in the lower, righthand corner, you'll see the pagination numbering. Do you see that?

A   Page 4, in the lower, righthand corner?

Q   In the lower, righthand corner, it will say "Page 14 of 138."

A   Right. I have it.

Q   You're on that page? Is that the -- do you recognize

that as the declarations page for the CNA policy?

A    No, I don't have it.  Oh, right here it is.  Yes.

Q    And looking at that declarations page, that indicates, does it not, that the policy provides an aggregate limit of liability of $2 million plus another $1 million for Side A coverage for insured persons?  Is that correct?

A    That's correct.

Q    So, at least with respect to coverage for an insured person under the policy, the CNA coverage limit is $3 million, not $2 million, right?

A    It could be.  It's $2 million, plus an additional 1 million if you fall under certain categories.

Q    Right.  That's if you're -- if it's Side A coverage, right?

A    That's correct.

Q    You understand Side A coverage is coverage for insured persons like Ms. Hunsicker?

A    I -- I don't know what the Side A college [sic] is.  Could be.

Q    Well, if you go -- turn to the next page in the CNA policy and take a look at the top of the page, it says:

        "Insuring agreement Side A" --

A    Right.

Q        "-- we will pay non-indemnifiable loss on behalf of
        an insured person arising from a claim against such

insured person first made during the policy period."

You understand that the Side A coverage is for individual insured persons.

A    Yes.

Q    Okay.  And that coverage, the aggregate amount available for that coverage is $3 million, the 2 million plus the one, right?

A    For the insured person.  But that's a legal term that has to be --

Q    Yep.

A    -- determined by the Court, if -- if she would be an insured person.

Q    Now, going back to your affidavit, T-3, Paragraph 11(b).  There, you say there's a coverage limit under the Zurich excess policy of $3 million.  Is that right?

A    That's correct.

Q    Okay.  And in your binder, there should be an Exhibit T-6.

A    I have it.

Q    Do you recognize that as the Zurich excess policy?

A    I do.

Q    Now, on this one, it's a little -- the pagination is off a little bit.

If you could turn -- do you see the production numbers

at the bottom of the page, "CaaStle 220 Production," and there's a number?

A    I --

Q    If you turn to --

MR. HUGHES:  Excuse me.

MR. CLARK:  Oh, sorry.

MR. HUGHES:  Ours don't have that.

THE WITNESS:  Our -- yeah, those --

MR. CLARK:  Okay.  Sorry about that.

BY MR. CLARK:

Q    If you'd count back from the start of this document, since the pagination is not consecutive, and go to the seventh page from the front.  It should be "Zurich Excess Select Insurance Policy Declarations."  Do you see that?

A    Okay. Let me just see.  Let me -- what Roman Numeral would be on with the --

Q    Roman Numeral.  I don't see a Roman Numeral.

A    Okay.  Well, my seventh page back -- or maybe is it -- wait a minute.  It's -- okay.  You're counting both sides, right?  Not --

Q    Yes.

A    -- the second --

Q    Count each --

A    -- side.  All right.

Q    -- side as --

A    One, two --

Q    -- a page and count back seven pages.

A    Okay.

Q    It should be the declarations page.

A    Yeah.

Q    Do you see that?

A    I see.  I counted back seven pages, and it was on both sides.  Yes.

Q    But are you at the section -- the page that is entitled "Declarations" up at the top?

A    Yes.  It's under --

Q    Okay.

A    -- "Zurich Excess Select Insurance Policy," and underneath is the lowercase word, where it's saying "declaration."

        THE COURT:  Mr. Miller, if you'd be kind enough, I just want to make sure that you speak into the microphone --

        THE WITNESS:  Okay.

        THE COURT:  -- that the court reporter gets you.  Okay?

        THE WITNESS:  Okay.

        THE COURT:  Thank you.

        THE WITNESS:  That's fine.

        MR. CLARK:  Great.

BY MR. CALHOUN:

Q   Now, looking at that declarations page in the Zurich policy, do you see Item 2 down near the bottom?  It says aggregate limit of liability $2 million?

A   Yes.

Q   So the Zurich policy provides an aggregate limit of liability of $2 million, not $3 million, right?

A   That's correct.

MR. CLARK:  That's all I have.  No further questions, Your Honor.

THE COURT:  Very well.

Any redirect?

MR. HUGHES:  No, Your Honor.

THE COURT:  Thank you, Mr. Miller.  You may step down, sir.

THE WITNESS:  Thank you, Your Honor.

Do you want me to leave the exhibits here or ...

THE COURT:  Sure.

(Witness excused)

THE COURT:  Mr. Hughes, does the debtor have any additional -- or the trustee have any additional evidence or testimony or should --

MR. HUGHES:  Yes.

THE COURT:  -- we turn it --

MR. HUGHES:  Yes, Your Honor, just documents.

THE COURT:  Okay.

MR. CLARK:  While he's gathering his documents, I wanted to introduce you to my colleague Mr. Ketan Ganase from our Miami office.

THE COURT:  Very good.  Welcome, sir.

MR. GANASE:  Good morning.  Thank you, Your Honor.

THE COURT:  Good to see you.

MR. CLARK:  He has been admitted *pro hac vice*.  And when we get into argument, if the Court has any in the weeds questions about the Florida action --

THE COURT:  And the --

MR. CLARK:  -- and procedures, he's more familiar than I, and I might call on him.

THE COURT:  That sounds great.  I appreciate that.  Thank you.

MR. CLARK:  Thank you, Your Honor.

MR. HUGHES:  Your Honor, to streamline things, as I said before, we have agreed among the parties to admit all of the exhibits that are in our binder with respect to the adversary.  Those are Exhibits 1 through 6.  I believe 3 has already been admitted.  But I would move the admission of T-1, T-2, T-4, T-5, and T-6.

THE COURT:  I'm not sure that T-3 was actually admitted.  We referred to it.

But I'll just confirm.  Are there any objections to the admission of the documents?

MR. CLARK:  No objection.

THE COURT:  Very well.  They are all admitted.

(Exhibits T-1 and T-2 received in evidence)

(Exhibits T-4 through T-6 received in evidence)

MR. HUGHES:  Thank you, Your Honor.

Your Honor, we -- I would like to just briefly, before closing out, I would like to just offer a brief explanation of the significance of the exhibits that you've just admitted.

The -- first is the KSV complaint in Florida.  In our view, what that shows is that the claims asserted, which include breach of fiduciary duty claims, are all based on the same common fraud that's at issue in this case.

The P180 complaint I think, at this point, we can disregard.  That was in there because we hadn't yet settled.

The Florida docket is Exhibit T-4.  Your Honor, that -- the significance of that is that it shows that a default judgment was entered for $50 million and that the motion to vacate that judgment has been denied.

And Your Honor, finally, the two insurance policies simply show the terms of the D&O insurance, the underlying layer and the excess layer.

So that's it for the exhibits, Your Honor.  If the -- if you want to address any other evidence or documents with KSV, I can stand aside.

THE COURT: Yeah. Mister -- that sounds fine. Mr. Clark?

MR. CLARK: Your Honor, we just move the admission into evidence of our exhibits, Exhibits KSV-1 through 6. I believe there are no objections.

THE COURT: Mr. Hughes, no objection?

MR. HUGHES: No objection, Your Honor.

THE COURT: Very well. They're admitted.

(Exhibits KSV-1 through KSV-6 received in evidence)

MR. CLARK: And as I said earlier, Your Honor, we don't have any witness to propose beyond our cross-examination of Mr. Miller. So I think --

THE COURT: Then I think --

MR. CLARK: -- the record --

THE COURT: -- we turn to argument.

MR. CLARK: -- the evidence record is probably closed.

THE COURT: I agree.

MR. CLARK: Thank you, Your Honor.

THE COURT: Okay.

MR. CLARK: Your Honor, if I may proceed with argument?

As we asserted in our papers, the claims for breach of fiduciary duty that are in KSV's complaint are property of the estate. The test for something like that is: Is it a

claim that the trustee could bring and is it general to all creditors?

And I would ask the Court to please refer to the KSV complaint --

THE COURT:  I'm there.

MR. HUGHES:  -- which is Exhibit T-1 --

THE COURT:  Okay.

MR. HUGHES:  -- because I'd like to focus on what's actually in the complaint.

So Count 3 of the complaint is a breach of fiduciary duty count against Ms. Hunsicker as CEO, and then Count 4 is -- I'm sorry.  Yes, 3 is a breach of fiduciary duty claim against Ms. Hunsicker as a board member or director, and Count 3 is -- Count 4 -- I'm sorry -- is a very similar count, except it's in her capacity as a CEO.

So those breaches of fiduciary duty claims, I mean, if we look at Paragraph 66, the allegation is that there's a breach of fiduciary duty and that the circumstance is that Ms. Hunsicker used some or all of the proceeds of KSV's investments in CaaStle almost immediately after receiving it in transactions involving other countries -- companies.  And I'm paraphrasing.

THE COURT:  I see it.

MR. HUGHES:  So the allegation is that money was brought in by an investor of CaaStle, it's CaaStle's money,

and she used it for other purposes.

THE COURT:  So how --

MR. HUGHES:  That's a claim --

THE COURT:  I'd ask you:  How do I -- I'd like to discuss a little bit the submissions from your friends on the other side suggest that at least some of these claims are direct, that they're the function of direct communications between representatives of KSV and Ms. Hunsicker; they weren't necessarily global communications to shareholders.

I saw the reference in the papers to the shareholder letter and, obviously, the references to the -- frankly, the cooked books.  But how do I deal with an argument that there may be direct claims here and --

MR. HUGHES:  Some of them -- I'm sorry to cut you off.

THE COURT:  Go ahead.  Yeah.

MR. HUGHES:  Some of them may be direct claims.  But the two breaches of fiduciary duty claims are clearly claims that belong to the estate and it's a violation of the stay to bring them.

The other -- and --

THE COURT:  Okay.

MR. HUGHES:  -- if I may?

THE COURT:  Yeah.

MR. HUGHES:  The other claims, we don't claim that

all of the counts in the complaint assert claims that are property of the estate; it's just the breach of fiduciary duty claims.  But the others fall under the category of they're closely related, it's all the same nucleus of facts, and they fall under the category of chasing the same defendants, based on the same actions.  There are limited -- there's a limited pool of funds that those potential defendants are going to have.  And it's a problem for the estate if you have the trustee pursuing them on behalf of creditors and whoever wants to pursuing their claims on behalf of themselves.

THE COURT:  Okay.

MR. HUGHES:  Your Honor, the case that we cite to at length in our paper is the Fisher v. Apostolou case, which is from the Seventh Circuit.  The facts there, the fact pattern was similar to a Ponzi scheme; it involved commodities, but it was analogous to a Ponzi scheme.  There were $64 million in claims and only $2 million in assets available.

And even though the claims that were going to be brought by the trustee were not the same as the claims that would be brought by others, the Seventh Circuit ruled that it was appropriate to enjoin the prosecution of those other claims because of the close relationship to the claims the trustee would bring.  The Seventh Circuit concluded that it

was appropriate to enjoin them because of the impact on the trustee's efforts to recover; again, the same limited pool of money and possession of the same defendants, as a result of the same facts, performed by the same individuals, as part of the same conspiracy.

Your Honor, another aspect of this is that KSV is an equity holder. All claims of equity holders, under 510(b) of the code --

THE COURT: Are subordinated.

MR. HUGHES: -- are subordinated. They can't jump ahead of creditors when their claim is based on securities. And many have tried, in many different ways, to say yes, I'm a shareholder, but I have these claims, and that makes me a creditor. And that pretty much, universally, fails.

Your Honor, KSV should not be able to leapfrog over other creditors and collect based on their securities claim ahead of creditors.

And Your Honor, the -- excuse me for one moment.

THE COURT: Take your time.

(Pause in proceedings)

MR. HUGHES: That's my direct presentation, Your Honor.

THE COURT: Okay.

MR. HUGHES: If Your Honor has any questions, I'm happy to address them.

THE COURT:  No.  I want to hear from Mr. Clark, and I'll certainly give you the opportunity to reply.

THE COURT:  Mr. Clark.

MR. HUGHES:  Thank you.

MR. CLARK:  I'm surprised, Your Honor, for all the times that I've appeared in front of you, that you actually still want to hear from me.

THE COURT:  I do.

(Laughter)

MR. CLARK:  Let me start with the 510(b) issue that Mr. Hughes just raised.  510(b) provides that claims against the debtor by equity holders are subordinated to come behind all of the other creditors.  Our claims here are not against the debtor; they're against Ms. Hunsicker --

THE COURT:  Ms. Hunsicker.

MR. CLARK:  -- a nondebtor, so 510(b) just doesn't -- it's a red herring, it has no application here.

With respect to the breach of fiduciary duty claims, to the extent those claims -- and there may be some aspect of those claims that are based on other facts and allegations.  But to the extent those claims are based on direct communications by Ms. Hunsicker with KSV representatives that induce them after they were -- after their initial investment in the company, induce them to invest further, those are direct claims.  Those are claims

based on misrepresentation, nondisclosure, false disclosures. And the case law indicates that those types of claims, communication, miscommunication, misstatement claims, are direct, not derivative.

With respect to Fisher versus --

THE COURT:  Well, let me ask you a question.  And maybe I've -- I want to think through this proposition.  As a general proposition -- and correct me, again, if I'm wrong -- when a debtor makes -- or when a company is soliciting investments and tells the world we got a great company, our Theranos blood testing thing is really fabulous, you should all invest, and it turns out that it's a tissue of lies, I -- my belief is that the case law says that the breach of the duties, the failure to adequately disclose accurate information, the concealment of information to the investor or shareholder community at large becomes an estate claim because harm has been done to the estate.

And then, in a direct context, we have -- and I think you may have some of these allegations in your complaint -- we have a separate consideration of was I approached directly by the company that looked at me in the eye and said I'm not telling the rest of the world, but this is what I'm telling you, and it's a fantastical lie and you have been personally defrauded, giving rise to a direct claim from that conversation that other shareholders wouldn't have

the benefit of.

Am I drawing a distinction that's supported in the case law or not?

MR. CLARK:  Yes, Your Honor.

THE COURT:  Okay.

MR. CLARK:  It's one thing if we're talking about, for example, a public company offering securities to the market under an S-1 registration statement that is --

THE COURT:  Wrong.

MR. CLARK:  -- sent out to the entire world.

THE COURT:  Right.

MR. CLARK:  It's an entirely different matter when it's, as you say, one to one, look them in the eye and say this is a great company, this is a great investment opportunity for you guys for the following six reasons, and they're a false.  That becomes a direct claim for the investor against the person making a misrepresentation.

There's also a claim -- no mistake about it, that our clients KSV have claims against the debtor based on the fraud that Ms. Hunsicker --

THE COURT:  Uh-huh.

MR. CLARK:  -- committed.  But those claims are not the claims that were -- that are at issue here, today, on these motions.

The claims that we've brought are against Ms.

Hunsicker, the nondebtor who made the direct, face-to-face, person-to-person communication.  And on that basis, I think it's -- they are direct claims, not derivative claims, Your Honor.

With respect to Fisher v. Apostolou, I have to tell you I read that case a number of times.  It's reasonably short.  There isn't an extensive exposition of the facts underlying the Court's analysis and decision.

I would say that it is not binding here.  It has -- to my knowledge, I had it Shepardized, and I couldn't find any indication that that case has ever been cited, referred to, discussed, and certainly not condoned or approved by the Third Circuit Court of Appeals.

So these cases involving these kinds of fraudulent misrepresentations are fact-intensive.  And I would suggest that, on the facts here, Your Honor, a different result is warranted than in that case.

The way I look at it, there's --

THE COURT:  I guess I'd ask you why.  And I confess, I did not Shepardize the decision; I did read it.

But the concern is not limited to that case.  That case is not necessarily presenting a novel proposition.

MR. CLARK:  Uh-huh.

THE COURT:  I think that case is extending or developing a framework of how we look at bankruptcy; that it

is a collective proceeding and we try to avoid the race to the courthouse the parties have touched on in their papers.

But that, in this situation, for example, in the next motion, you're asking for relief from stay for a judgment that would exhaust all available insurance in your favor, obviously. And as a bankruptcy person, you kind of look at that and say that's not typically how we deal with these issues, we respect people's rights, but we're in a more collective proceeding. That's how I read the Fisher decision.

And in this case, again, you've got the first judgment; it's large. It exceeds, presumably, the value of any existing assets in hand, as well as insurance. So why is that proposition inapplicable to the matter that I have in front of me?

MR. CLARK: Your Honor, the way I look at it, the proposition seems to me that the entire world of actors who may have claims, potential claims, against the debtor, as well as against individual nondebtor directors and officers, they have to be frozen in place. They can't go forward and assert their claims against nondebtors. These are claims between a nondebtor plaintiff and a nondebtor defendant, and they're being enjoined from doing so for an indefinite period of time while the debtor decides what it wants to do.

Here -- and I'm not being critical of Mr. Miller in

any way, shape, or form.  But just --

THE COURT:  Sure.

MR. CLARK:  -- taking a look at the chronology of how things came down here, what happened is that, in late March of this year, the CaaStle Board finally revealed to the company's investors, including KSV, the massive, years-long financial fraud that had been perpetrated by Ms. Hunsicker.

Within three weeks of that revelation, on April 18th, KSV, a nondebtor, filed its Florida complaint against Hunsicker, also a nondebtor.  They were careful not to sue CaaStle because it was apparent to them, at that point, that CaaStle was going into bankruptcy.  And CaaStle, indeed, did become a Chapter 7 Debtor when it filed its petition here on June 20th.  And immediately after that, Mr. Miller was appointed as the trustee.

Now what did KSV do?  KSV simply expeditiously pursued its claims in Florida and, on August 19, obtained a judgment by default against Ms. Hunsicker.

A month later, one month later, three months after being appointed as the trustee, on September 18th, Mr. Miller filed his adversary proceeding and preliminary injunction motion against KSV to enjoin it from pursuing the claims against Hunsicker.

In the meantime, on August 12th, Ms. Hunsicker moved for relief from the automatic stay to permit the

debtor's D&O insurer to pay her defense costs and attorneys' fees, as she was an insured person under the D&O policy. And the trustee responded by filing a limited objection to that motion, but he eventually agreed to the relief that Ms. Hunsicker sought, and an agreed order granting that motion was entered on October the 3rd.

In so doing, I would suggest that the trustee had -- has implicitly conceded that Hunsicker's losses in KSV's Florida action are covered, were covered and entitled to payment under the debtor's insurance policies. That's what they agreed to with respect to defense costs and attorneys' fees.

And under the express provisions of the D&O policy, Ms. Hunsicker's losses are not only her defense costs and fees, but also any judgments or settlements against her. And so the D&O policy also provides that Ms. Hunsicker's losses are entitled to priority of payment over the entity coverage that's available for the debtor. That's in the D&O policy, that's Exhibit T-3 [sic], D&O policy at Page 23 of 138, Section 13, and Page 52 of 128, Section 13.

Give that, as Your Honor has observed, the Florida judgment is very large; it's ten times the five-million-dollar coverage limit under the applicable policies here, given the priority of payment provisions for the individual insured, Ms. Hunsicker, those insurance policy proceeds under

the case law are not property of the debtor's estates, the automatic stay under Section 362 doesn't apply to those proceeds, and KSV is not in violation of the stay in seeking to recover proceeds to partially satisfy their judgment down in Florida.  Under those circumstances, Your Honor, I suggest there is nothing unfair or inequitable about KSV acting diligently to obtain at least some satisfaction of its judgment in Florida.

By comparison, by contrast, the trustee's belated effort to jump to the head of the line on the estate's potential claims, which, five months into this case, haven't been brought yet -- again, I'm not being critical; I'm just saying that's what the calendar shows --

THE COURT:  Right.

MR. CLARK:  -- that, I would suggest, is unfair to KSV, which as diligently, expeditiously, and properly pursued relief in a court with jurisdiction over its claims and the nondebtor party subject to those claims.

People call that a "race to the courthouse," as though that, necessarily, is something bad.  It is not. Parties are entitled, under the law, to pursue the claims they have quickly, expeditiously, as best as they can.

We're not suing the company, we're not suing the debtor, we're not trying to assert a claim against the debtor in that action.  So that's sort of the way I look at it.  And

that, basically, is both motions, by lift stay --

THE COURT:  It is.

MR. CLARK:  -- because the two motions, the PI motion and the lift-stay motion are really just mirror images.

THE COURT:  They're two sides of the same coin.

MR. CLARK:  Exactly.

THE COURT:  I agree with you.

MR. CLARK:  So Your Honor can -- you can grant one, in which case, if you do, you've mooted out the other motion; or you can deny them both and just leave the parties to go pursue their rights however best they think they want to proceed.

I do have one more -- just one more brief world I want to say about the objection that Ms. Hunsicker filed to our motion.  For the most part, the Hunsicker objection seeks -- it's an odd thing.  It's -- it reads like an appellate brief in the Florida Court System.

THE COURT:  Yeah.

MR. CLARK:  She's seeking to re-litigate service and notice issues in the Florida action here.  As shown by the Florida Court's October 24th order denying her motion to vacate the default judgment, which is Exhibit KSV-2, those issues, service and notice issues, were raised and rejected in the Florida action.

Specifically, the Florida Court found that:

One, Hunsicker was personally served with the summons and complaint;

Two, she and her counsel had actual notice of the Florida action;

Three, KSV properly electronically filed and served all notices in that action;

But four, Hunsicker and her counsel simply failed to enter an appearance or register for electronic service until well after the default judgment had been entered against her.

On those facts, Your Honor, KSV did nothing wrong or, as they say in their papers, "underhanded," a pretty strong word.  Where I come from, it's generally considered a fighting word.

Hunsicker, similarly, in her objection, at Paragraph 35, she similarly claims that her counsel weren't provided with notice of KSV's lift-stay motion in this court. That is also not true, Your Honor.

As shown on the notices of electronic filing on the Court's docket, at Docket Numbers 109 and 110, which are attached as Exhibit A to our reply brief; the reply brief at D.I. 120, three people at Hunsicker's counsel's firm -- Loren Barron, Ian Densmore, and Kristen Swift -- were electronically served with our motion papers.

So there's no basis to claim that KSV has somehow unfairly prejudiced Ms. Hunsicker and her counsel by failing to property serve papers on them here or in the Florida action.

Your Honor, I think I've droned on long enough. If you have further questions, I'm happy to address them. I appreciate the Court's time and would urge that you grant our motion to lift stay.

THE COURT: Very well.

Mr. Hughes?

MR. HUGHES: Your Honor, if I may, I haven't made any presentation on the motion for relief from stay. Given the time, I would suggest that we take up the motion for relief from stay after the 12:15 break. There are different exhibits and different facts that I want to bring out in that context that are important.

THE COURT: No, I'm going to take the invitation that Mr. Clark gave me. I expect he may regret giving me that invitation. But here's what we're going to do.

MR. HUGHES: And I'm sorry to interrupt, Your Honor.

I also wanted to just respond --

THE COURT: It's not --

MR. HUGHES: -- to some of the --

THE COURT: -- going to get any better for you.

MR. HUGHES:  I'm sorry?

THE COURT:  It's not going to get any better for you, so --

MR. HUGHES:  Okay.

THE COURT:  -- I wouldn't interrupt.

MR. CLARK:  Your Honor, I --

MR. HUGHES:  I'm sorry.

MR. CLARK:  Please, let him finish.

THE COURT:  The -- I'm busting your chops.

The -- I am going to deny without prejudice the motion for relief from stay.  And I am going to grant for a period, coterminous with the deal with P-180, the trustee's request for a preliminary injunction.  And I'll give you my reasons.

It may be that there are direct claims, but it also seems to me that there are -- substantially, much of the thrust of the complaint filed by KSV actually appears to me to be claims that would be derivative in nature.  And I don't think it's that simple a prospect to hide them out.  And the case law teaches that Bankruptcy Code Section 362 precludes the prosecution of those claims or causes of action, absent leave of the Court.

So I'm satisfied that cause does exist for the entry of a preliminary injunction, consistent with that which has been requested by the trustee.  And in doing so, I'm

satisfied that the trustee specifically has carried his burden on the four prongs, specifically in terms of the prospect of irreparable harm and his likelihood of success on the merits as he moves forward with this matter.

It is a basic proposition that a Chapter 7 Trustee needs an -- has fiduciary and statutory obligations to all stakeholders and is obliged to conduct an appropriate investigation and take steps in order to husband, preserve, and then marshal the assets of the estate for distribution to all unsecured creditors.

I have read the Fisher case carefully. I don't know that that is dispositive; it's certainly not binding upon the Court, but it is not dispositive of the issues that are before me.

But what I have is, largely, a request for preservation for the status quo. And I have a default judgment that's been obtained. And I make no comment on the Florida litigation. What I have is a default judgment and I'm not going to handicap somebody's odds on reconsideration or appeal or comment on the back-and-forth about the entry of that judgment. That judgment exists and I'm going to treat it as such.

So my ruling with respect to the denial of the relief from stay really is based upon the trustee's concerns and considerations with respect to the insurance that is out

there.  And again, I think that I would permit KSV to renew its motion for relief from stay at an appropriate time, as the facts further develop.  But as a practical matter, the trustee expresses concerns that, in the absence of an order enforcing the stay or keeping the stay in place, that, again, that asset may disappear.

And so, with that, again, I didn't mean to cut parties off.  But really, Mr. Clark, I think correctly, noted that the two motions are really two sides of the same coin. And I do believe, at least for the time being, it is appropriate to enjoin continued prosecution of the litigation.

Mr. Clark.

MR. CLARK:  One question for clarification, Your Honor.  The procedural posture of the Florida action right now is that there is a default judgment in place.  Ms. Hunsicker has filed a notice of appeal.  Maybe Mr. Ganase can tell you what --

THE COURT:  I would --

MR. CLARK:  -- the timing is.

THE COURT:  Let me --

MR. CLARK:  But if she prosecutes her appeal, are we allowed to --

THE COURT:  I --

MR. CLARK:  -- continue to defend it?

THE COURT:  To me -- I appreciate the clarification.  My instinct would be that you should be afforded the opportunity.

My issue is you've asked for relief from stay to execute upon a judgment.  I have expressed -- the trustee has expressed his concerns of the effect of that on the insurance.  And I certainly understand the mechanics of the D&O insurance and Side A versus Side B, and I understand Ms. Hunsicker's submission.

I do not feel strongly, and I don't necessarily believe that the stay should preclude the appellate proceedings that are ongoing.  It may actually be helpful to find closure on those issues.  So, to me, at least intuitively, I would not say that I would enjoin the continued prosecution for appellate purposes.

The issue that I have, and I think that the trustee had, was upon execution of the judgment as you have it.

MR. CLARK:  Execution and enforcement of the judgment, and I understand that.  And I'm sorry Mr. Hughes will draft up an order that so provides.  We'll take a look at it and get it submitted under certification of counsel.  But that's the distinction I was trying to get to.

THE COURT:  I appreciate the clarification.

MR. CLARK:  Thank you, Your Honor.

THE COURT:  And again, to me, it would seem to me

that, if there is -- fairness requires that, unless somebody tells me differently, there is -- from Ms. Hunsicker's point of view, there is a pall over your default judgment, it's on appeal, et cetera, et cetera.  Answering that question doesn't do violence to the considerations the trustee was attempting to protect with his injunction.  And so, to me, that should be fine, and I would expect the parties to wordsmith that order.

MR. CLARK:  Great.  Thank you, Your Honor.

THE COURT:  All right.  Mr. Hughes.

MR. HUGHES:  Thank you, Your Honor.

THE COURT:  Does that conclude the matters that we have on for today?

MR. HUGHES:  Your Honor, there was -- as a technical matter, there's a fourth item on the agenda, it's the pretrial conference related to the adversary.  And the parties --

THE COURT:  I think --

MR. HUGHES:  -- agreed --

THE COURT:  -- we kind of had that.

MR. HUGHES:  -- agreed ahead of time that we would see what happens today and --

THE COURT:  Look, I'm not trying to rush anybody.

MR. HUGHES:  Yeah.  No, we'll --

THE COURT:  If -- I'm going to go to my meeting.

If you believe it's appropriate, I'll see you at one o'clock, if there's more to discuss.

MR. HUGHES:  No, we --

MR. CLARK:  I don't think so.

MR. HUGHES:  Our preference, Your Honor, if it's acceptable to the Court, is to push that off for another day.

THE COURT:  That sounds find.  You can confer with Ms. Bello.  And given that we've got parties that may be remote, I would -- if it's a pretrial, I'm happy to do it, either live, or by Zoom, or hybrid, if people don't necessarily want to travel.

MR. CLARK:  It seems to me, Your Honor, that we're going to be enjoined from enforcing or executing on our judgment for -- I believe it's 150 days.

THE COURT:  I think it's 150 days.

MR. HUGHES:  Yes.

MR. CLARK:  So we should --

THE COURT:  We have time --

MR. CLARK:  -- I think --

THE COURT:  -- to deal --

MR. CLARK:  -- postpone --

THE COURT:  -- with this.

MR. CLARK:  -- the pretrial and scheduling conference to sometime after that.

THE COURT:  That would be fine.

The other point that I would make, Mr. Hughes -- and again, you're just -- because I will just let you know internally, the way that we deal with the Chapter 7s, in terms of scheduling -- this has all been fine, you've been very clear with my chambers.  But as we get to further proceedings, if we have evidentiary matters, et cetera, I'm just going to ask that you make sure that Ms. Bello knows that this is a substantive hearing.

The Chapter 7 cases are, typically, even the corporate ones, are typically scheduled for short hearings because they generally are uncontested, they often come off, or there's not a lot going on.  So, again, if we have the full monte coming down the pike, then I would look for just guidance, so that we make sure that we've got enough time.  And I do have time, I do have enough time, I just have this meeting, so -- but I think that that should conclude where we are.

MR. HUGHES:  Yes.  Understood, Your Honor.  We will do that going forward.

THE COURT:  Great.

All right.  Any other matters?

(No verbal response)

THE COURT:  All right.

MR. HUGHES:  Appreciate it.

THE COURT:  I appreciate everyone's time.  With

that, we are adjourned.  Thank you, Counsel.

MR. CLARK:  Thank you, Your Honor.

(Proceedings concluded at 12:12 p.m.)

*****

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

_____        November 24, 2025

1Coleen Rand, AAERT Cert. No. 341

Certified Court Transcriptionist

For Reliable